**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Trevor Sherman, | No. CV-20-01584-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Pending before the Court is Plaintiff Trevor Sherman's appeal from the Commissioner of the Social Security Administration's ("SSA") denial of social security disability benefits based on a finding that Plaintiff is no longer disabled. (Doc. 24). The Plaintiff filed his opening brief on September 23, 2021 (Doc. 24) and Defendant responded (Doc. 26). Plaintiff did not file a timely reply. The Court now rules.

**I.     BACKGROUND**

The issues presented in this appeal are whether substantial evidence supports the Administrative Law Judge's ("ALJ") determination that Plaintiff was no longer disabled as of March 1, 2015 and whether the ALJ committed legal error in his analysis. (Doc. 24 at 4; Doc. 19-3 at 11, 20).

**a. Factual Overview**

Plaintiff was 40 years old at the time of his hearing. (Doc. 24 at 6). He has 10 years of education and past relevant work experience as a pizza delivery driver. (*Id.*) Plaintiff was previously awarded social security disability benefits in March 2006 for narcolepsy

with an established onset date of September 3, 2004. (*Id.* at 6). In a prior decision, the SSA found that Plaintiff was no longer disabled as of March 1, 2015, and the case was remanded to the ALJ "to consider whether the claimant's disability has ended pursuant to Social Security Ruling 13-3p." (Doc. 19-3 at 11). The ALJ found that Plaintiff's disability ended on March 1, 2015. (*Id.*) The SSA Appeals Council denied a request for review of that decision and adopted the ALJ's decision as the agency's final decision. (*Id.* at 2).

### b. The SSA's Eight-Step Evaluation Process for Continuing Disability

In order to determine whether a claimant's disability is continuing or has ceased, and therefore, whether the claimant is still entitled to disability benefits, ALJs are required to follow an eight-step process. *See* 20 C.F.R. § 404.1594(f).

At step one, the ALJ determines whether the claimant is engaged in "substantial gainful activity." *Id.* § 404.1594(f)(1). Substantial gainful activity is work activity that is both "substantial," involving "significant physical or mental activities," and "gainful," done "for pay or profit." *Id.* § 404.1572(a)–(b). If the claimant has engaged in substantial gainful activity, the claimant's disability is deemed to have ceased and benefits are terminated. *Id.* § 404.1594(f)(1). If the claimant is not engaging in substantial gainful activity, the analysis proceeds to step two. *Id.*

At step two, the ALJ analyzes whether the claimant's impairment meets or equals the impairments set out in the Listing of Impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* § 404.1594(f)(2). If a Listing is met, the claimant continues to be disabled, and the evaluation stops. *Id.* If not, the analysis proceeds to step three. *Id.*

At step three, the ALJ evaluates whether medical improvement has occurred since the original determination of disability. *Id.* § 404.1594(f)(3). If a medical improvement resulted in a decrease in the medical severity of the claimant's impairments, the analysis proceeds to the next step. If no medical improvement occurred, the analysis skips to step five. *Id.*

At step four, the ALJ determines whether the medical improvement is related to the claimant's ability to work. *Id.* § 404.1594(f)(4). Medical improvement is related to the

ability to work if it results in an increase in the claimant's capacity to perform basic work activities. *Id.* If the improvement is related, the analysis skips to step six. *Id.* However, if the improvement is not related, the analysis proceeds to step five. *Id.*

Step five applies in one of the following situations: (1) there has been no medical improvement; or (2) the improvement is unrelated to the claimant's ability to work. *Id.* § 404.1594(f)(3)–(4). At step five, the ALJ analyzes whether any exception to medical improvement exists. *Id.* § 404.1594(f)(5). If no exception applies to the claimant, the ALJ must still find the claimant to be disabled. *Id.* If the first group of exceptions applies to the claimant, *see id.* § 404.1594(d), the analysis advances to step six, *id.* If the second group of exceptions applies to the claimant, *see id.* § 404.1594(e), the ALJ will find that the claimant's disability has ended, *id.* § 404.1594(f)(5).

At step six, the ALJ evaluates whether the claimant's impairments are sufficiently severe to limit his physical or mental abilities to do basic work activities. *Id.* § 404.1594(f)(6). If the impairments are not sufficiently severe, the claimant is no longer disabled. *Id.* Otherwise, the analysis proceeds to step seven. *Id.*

At step seven, the ALJ assesses the claimant's current residual functioning capacity ("RFC") to determine whether he can perform past relevant work. *Id.* § 404.1594(f)(7). If the claimant has the capacity to perform past relevant work, the claimant is no longer disabled. *Id.* If not, the analysis proceeds to step eight. *Id.*

Finally, at step eight, the ALJ determines whether the claimant can perform any other substantial gainful activity. *Id.* § 404.1594(f)(8). If so, the claimant is no longer disabled. *Id.* If not, the claimant's disability continues. *Id.*

### c. The ALJ's Application of the Factors

Here, at the first step, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since his comparison point decision ("CPD"), February 23, 2006, through his date last insured, June 30, 2018. (Doc. 19-3 at 13).

At the second step, the ALJ determined that Plaintiff's narcolepsy did not meet or medically equal Section 11.03 or any other listing in the Listing of Impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 14).

At the third step, the ALJ determined that based on Plaintiff's reported symptoms and treatment, Plaintiff's impairment had significantly improved and resulted in decreased severity as of March 1, 2015. (*Id.* at 14–15).

At the fourth step, the ALJ determined that Plaintiff's medical improvement was related to his ability to work because Plaintiff "no longer had an impairment or combination of impairments that met or medically equaled the same listing[] that was equaled at the time of the CPD." (*Id.* at 15). Because of the ALJ's finding at step four, the ALJ skipped step five.

At step six, the ALJ determined that as of March 1, 2015, Plaintiff's impairment was severe enough to impact his ability to perform basic work activities. (*Id.*)

At step seven, after evaluating Plaintiff's current RFC, the ALJ concluded that Plaintiff could "perform a full range of work at all exertional levels," except that Plaintiff "can perform unskilled work and must avoid exposure to heights and dangerous machinery." (*Id.*) The ALJ concluded that, as of March 1, 2015, Plaintiff has been unable to perform his past relevant work. (*Id.* at 18).

At the eighth and final step, the ALJ concluded that given Plaintiff's age, education, work experience, and RFC, a significant number of jobs existed in the national economy that he could have performed. (*Id.* at 19). Accordingly, the ALJ determined that Plaintiff was not disabled. (*Id.* at 20).

## II. LEGAL STANDARD

This Court may not overturn the ALJ's denial of disability benefits absent legal error or a lack of substantial evidence. *Luther v. Berryhill*, 891 F.3d 872, 875 (9th Cir. 2018). "Substantial evidence means … such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)). On review, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the [ALJ's] conclusion, and may

not affirm simply by isolating a specific quantum of supporting evidence." *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014)). The ALJ, not this Court, draws inferences, resolves conflicts in medical testimony, and determines credibility. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984). Thus, the Court must affirm even when "the evidence admits of more than one rational interpretation." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The Court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010.

## III. DISCUSSION

Plaintiff raises three claims of error: (1) the ALJ erred in finding that Plaintiff's narcolepsy was not still equal to the impairment listing in Section 11.03 of 20 C.F.R. Part 404, Subpart P, Appendix 1; (2) the ALJ improperly determined that Plaintiff's condition had medically improved; and (3) the ALJ erred by not properly evaluating and weighing the opinion of Plaintiff's treating physician Dr. David Baratz, as required by 20 C.F.R. § 404.1527. The Court addresses each in turn.

### a. Statutorily Defined Impairments

At step two, the ALJ determined that Plaintiff's narcolepsy did not meet or medically equal Section 11.03 (non-compulsive epilepsy) or any other listing in the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 19-3 at 14). Plaintiff argues that the ALJ's decision was made in error and goes against the requirements of POMS DI 24580.005 and DI 34131.013, and 20 C.F.R. §§ 416.920(d), 404.1520(d). (Doc. 24 at 4).

> Regarding Plaintiff's narcolepsy at step two, the ALJ found:
>> As of March 1, 2015, the claimant's impairment did not meet or medically equal listing 11.03 or any other listing. Listing 11.03, for non-convulsive epilepsy, requires evidence of seizure activity, including loss of consciousness or awareness, occurring more than once per week in spite of at least three months of prescribed treatment. As of March 1, 2015, the record shows the claimant's narcolepsy, in spite of at least

- 5 -

>three months of prescribed treatment, causes cataplexy only six times per year, well below the required frequency (Exhibit 2F/1, 6F/3, 12 F/1). Additionally, there is no impartial medical source opinion in the record that states or suggests the claimant's narcolepsy medically equals the criteria of any listed impairment.

(Doc. 19-3 at 14) (footnote omitted).

At step two, the ALJ must assess whether the claimant has an impairment or combination of impairments that meets or medically equals an impairment listed in the Appendix to the federal regulations. 20 C.F.R. Part 404, subpart P, Appendix 1. Conditions set forth in the Listing of Impairments are considered so severe that "they are irrebuttably presumed disabling, without any specific finding as to the claimant's ability to perform his past relevant work or any other jobs." *Lester v. Chater*, 81 F.3d 821, 828 (9th Cir. 1995). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir. 2013) (citing *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis in original); *see also Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005) (noting that the plaintiff bears the burden of proving that an impairment meets or equals the criteria of a listed impairment). However, the ALJ need not "state why a claimant failed to satisfy every different section of the listing of impairments" so long as there was an adequate evaluation of the evidence. *Gonzales v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990).

>Section 11.03 of the Listing of Impairments requires:
>>[N]onconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

*See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.03 (2012).[1] Although Plaintiff contends that his condition medically equaled Section 11.03 due to his narcoleptic symptom of "Excessive Daytime Sleepiness" ("EDS") occurring "almost daily" (Doc. 24 at 8–9), he does not demonstrate, using medical evidence, that his EDS alters his awareness, causes him to lose consciousness or manifest unconventional behaviors, or significantly interferes with his daily activities more than once per week. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.03 (2012). Neither the ALJ nor the Court can substitute Plaintiff's "allegations of pain or other symptoms for a missing or deficient sign or laboratory finding to raise the severity of [an] impairment[] to that of a listed impairment." *See* 20 C.F.R. § 404.1529(d)(3).

As discussed elsewhere in the ALJ's opinion, during a March 2015 consultative physical exam, Plaintiff "confirmed narcoleptic episodes were rare and did not report any narcoleptic symptoms during several visits to treating providers between March 2015 and September 2015." (Doc. 19-3 at 14). The ALJ also noted that Plaintiff's treating providers noted Plaintiff's own reports that his cataplexy episodes only occurred six times per year. (*Id.*) The ALJ also noted the medical evidence shows that Plaintiff's condition "is under reasonable control" with medication and that Plaintiff acknowledged his ability to perform "numerous activities of daily living." (*Id.* at 14–16).

Accordingly, Plaintiff failed to meet his burden of proving that he met or equaled the criteria of Section 11.03 because he failed to demonstrate that he had seizures or equivalent loss of consciousness more than once per week after three continuous months of taking his medication. *Kennedy*, 738 F.3d at 1176; *Burch*, 400 F.3d at 683; 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.03 (2012). Given the noticeable absence of evidence of Plaintiff's seizure activity or other loss of consciousness or interference with daily activities more than once per week while on his medication, the ALJ properly determined that Plaintiff's impairment did not meet or medically equal Section 11.03 based on

---

[1] The Court notes that Section 11.03 regarding the evaluation of non-compulsive epilepsy was eliminated from the Listing of Impairments in September 2016, and thus relies on a pre-September 2016 version of the Listing of Impairments for this analysis.

substantial evidence in the record. *See Burch*, 400 F.3d at 683 (plaintiff bears the burden of proving that an impairment meets or equals the criteria of a listed impairment).

Plaintiff's arguments that the ALJ failed to follow Policy Operations Manual System (POMS) DI 24580.005 and DI 34131.013, and 20 C.F.R. §§ 416.920(d), 404.1520(d) are without merit. First, with regard to POMS DI 24580.005 and DI 34131.013, as pointed out by Defendant, "POMS constitutes an agency interpretation that does not impose judicially enforceable duties on either this Court or the ALJ." *Lockwood v. Comm'r Soc. Sec.*, 616 F.3d 1068, 1073 (9th Cir. 2020) (citations omitted). Next, the applicable regulation for evaluating the continuation or cessation of a disability is Section 404.1594, not Sections 416.920 and 404.1520. *See* 20 C.F.R. §§ 416.920(a), 404.1520(a) ("This section explains the five-step sequential evaluation process we use to decide whether you are disabled"). Moreover, Plaintiff does not identify how the ALJ failed to abide by Sections 416.920(d) and 404.1520(d) or POMS DI 24580.005 and DI 34131.013. Thus, the Court does not find any error in the ALJ's decision on this basis.

### b. Improvement to Plaintiff's Medical Condition

Plaintiff next argues that the ALJ improperly found Plaintiff's narcolepsy had medically improved against the weight of the record evidence. (Doc. 24 at 10).

The ALJ considered multiple pieces of medical evidence in finding that Plaintiff experienced medical improvement related to Plaintiff's condition at the CPD. (*See* Doc. 19-3 at 14–15). At the CPD, Plaintiff's impairment was narcolepsy and found to medically equal Section 11.03 of 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 13).

The ALJ summarized evidence in the record that reflected a decrease in the severity of these medical opinions as follows:

> The medical evidence supports a finding that, as of March 1, 2015, there has been a decrease in medical severity of the impairment. At the time of the CPD, the claimant's Epworth scale score was 21 out of 24, indicating a high probability of sleep intervals (Exhibit 1F/2, 5, 31 and 32). However, the record contains no evidence of Epworth tests after the CPD, and narcolepsy does not produce any objective findings on imaging scans. As a result, the progress and severity of the

> claimant's narcolepsy must be evaluated predominantly by weighing his reported symptoms and treatment.

(Doc. 19-3 at 14). The ALJ opinion goes on to state:

> At the time of the CPD, treating provider David M. Baratz, M.D. found the claimant had severe daytime "hypersomnolence" based on the claimant's reports of narcoleptic episodes that occurred almost daily (Exhibit 1F/23, 31, 32, 34, 36). At that time, he had not found a medication that effectively treated his narcolepsy and associated symptoms (Exhibit 1F/32). In comparison, by November 2014, he reported prescription medications Dexedrine and Nuvigil mostly prevented narcoleptic episodes, and that he had been taking these medications to treat his narcolepsy for six or seven years (Exhibit 8E and 10F/3, 8). He repeatedly denied experiencing hypnagogic hallucinations after treatment with medication, and reported only occasional sleep paralysis, though not as frequent as before (Exhibit 1F/23, 2F/1, 4F/39, 7F/1 and 12F/1). In [] March 2015, during a consultative physical examination, the claimant confirmed narcoleptic episodes were rare and did not report any narcoleptic symptoms during several visits to treating providers between March 2015 and September 2015 (Exhibit 6F/3 and 13F/5-33). In June 2017, based on the claimant's reports that narcoleptic episodes only occurred six times per year, treating providers changed his diagnosis from "narcolepsy with cataplexy" to "narcolepsy without cataplexy" (Exhibit 14F/1). Additionally, based on the medical evidence, the claimant's condition is under reasonable control with Dexedrine and [Nuvigil] (Exhibits 14F, 15F and 16F). The evidence clearly shows a pattern of significant medical improvement in the claimant's narcolepsy.

(*Id.* at 14–15).

At step three of a continuing disability review, an ALJ considers whether a claimant has experienced medical improvement. Medical improvement is "any decrease in the medical severity of [an] impairment." 20 C.F.R. § 404.1594(b)(1). This determination involves a comparison between the claimant's condition at the CPD and the claimant's present condition using "symptoms, signs, and/or laboratory findings associated with [the] impairment(s)." *Id.* On appeal, the Court is "not deprived of [its] faculties for drawing specific and legitimate inferences from the ALJ's opinion [and may] draw inferences ... if

those inferences are there to be drawn." *Magallanes*, 881 F.2d at 755. Thus, the Court looks to the entirety of the ALJ's decision in determining whether substantial evidence existed for the ALJ's conclusion.

Specifically, Plaintiff argues that the ALJ makes five errors in his evaluation of the evidence, including: (1) an incorrect finding that "the record contains no evidence of Epworth tests after the CPD;" (2) an erroneous summary of Plaintiff's report on the frequency of narcoleptic attacks; (3) unsupported statements about Plaintiff's treating physicians' findings; (4) a false statement regarding Plaintiff's changed diagnosis; and (5) an improper substitution of the ALJ's own opinion for that of the medical experts. (*Id.* at 10–11).

First, the Court agrees with Plaintiff that the ALJ incorrectly stated that "the record contains no evidence of Epworth tests after the CPD." Instead, in two notes from Dr. Baratz from Plaintiff's follow up office visits, dated March 6, 2019 (Doc. 19-3 at 20) and July 29, 2019 (Doc. 19-10 at 55), Dr. Baratz noted that Plaintiff had an Epworth sleep score of 18 and 22, respectively. However, as pointed out by Defendant, the relevant period for a disability determination here is between the CPD, February 23, 2006, and Plaintiff's date last insured, June 30, 2018. *See Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998) ("To be entitled to disability benefits, [claimant] must establish that her disability existed on or before her date last insured."). Although "a claimant may offer retrospective diagnoses that relate back to the insured period to show disability," contemporaneous evidence is preferred. *Petty v. Astrue*, 550 F.Supp.2d 1089, 1097 (D. Ariz. 2008). So, while Plaintiff's post-date last insured Epworth scores are relevant, the ALJ reasonably relied on other substantial evidence in the record, as discussed above, that predates Plaintiff's date last insured and supports his finding. Thus, the ALJ's decision to exclude the post-date last insured Epworth scores from consideration was not made in error, and even assuming that it was, the Court concludes that any error was harmless. *See Marsh v. Colvin*, 792 F.3d 1170, 1172 (9th Cir. 2015) ("ALJ errors in social security cases are harmless if they are inconsequential to the ultimate nondisability determination.") (quotations omitted).

Next, Plaintiff argues that the ALJ incorrectly stated that by November 2014 Plaintiff's medications mostly prevented his narcoleptic episodes because the ALJ cites to Plaintiff's Seizure Questionnaire where Plaintiff reported that he has narcoleptic attacks 0-5 times per day, averaging once every other day with medications. (Doc. 24 at 10). However, the form in question is ambiguous as to whether Plaintiff's narcolepsy symptoms are controlled with medication. (Doc. 19-8 at 45–46). On the first page, Plaintiff reports that his "sleep episodes…can happen anywhere from 5 times a day to 0" and "on average once every other day," but on the last page, in response to a question on whether his medication prevents his symptoms, Plaintiff responded "mostly." (*Id.*) The ALJ is responsible for resolving ambiguities in the record evidence and the Court does not find error in the ALJ's finding that Plaintiff's statement that the medication mostly controls his narcolepsy is consistent with the record regardless of Plaintiff's other symptom statements listed on the same form. *Andrews*, 53 F.3d at 1039–40.

Next, Plaintiff argues that the ALJ incorrectly stated Plaintiff did not report any narcoleptic symptoms to treatment providers between March 2015 and September 2015 while erroneously citing to records that did not come from his treating providers. (Doc. 24 at 10). Upon review of the cited records, the Court does not find any harmful error in the ALJ's findings. Cited Exhibit 13F contains 2015 treatment records for Plaintiff's back and knee pain. (Doc. 19-10 at 2–34). Although these treating records are unrelated to Plaintiff's narcolepsy, the treating provider noted Plaintiff's past medical history of narcolepsy and listed his narcolepsy medication as currently prescribed. (*Id.* at 6, 9, 10). The ALJ reasonably determined that the absence of Plaintiff's reports on his narcolepsy symptoms during those provider visits infers an absence of Plaintiff's narcolepsy symptoms. *Allen*, 749 F.2d at 579 (holding that a court must affirm an ALJ's decision even if "the evidence admits of more than one rational interpretation.").

Additionally, while the cited Exhibit 6F is a Physical Residual Functional Capacity Assessment from March 2, 2015, and not a statement from a treating provider, the ALJ correctly noted that Plaintiff did not report any narcolepsy symptoms during that

1  assessment. Instead, Plaintiff informed the consultative examiner that his narcoleptic
2  episodes are rare under his prescribed treatment, occurring mostly in quiet environments.
3  (Doc. 19-9 at 119). The Court does not find harmful error in the ALJ's decision to rely on
4  Plaintiff's own symptom reports during the March 2, 2015 assessment, even though the
5  ALJ erroneously referred to the consultative examiner as a treating provider. *Marsh*, 792
6  F.3d at 1172. ALJs are permitted to rely on opinions and examination notes from non-
7  treating medical sources. *See* 20 C.F.R. § 404.1527.

8  Plaintiff next argues that the ALJ knowingly made the false statement "[i]n June
9  2017, based on the claimant's reports that narcoleptic episodes only occurred six times per
10 year, treating providers changed his diagnosis from "narcolepsy with cataplexy" to
11 "narcolepsy without cataplexy." (Doc. 24 at 11). Plaintiff disputes that his diagnosis
12 changed, "let alone for that reason." (*Id.*). In making his statement regarding Plaintiff's
13 changed diagnosis, the ALJ cites to Exhibit 14F (Doc 19-3 at 14), containing treatment
14 notes from Dr. Baratz and Nurse Practitioner Stacey Gourdoux dated November 1, 2013,
15 March 9, 2016, and June 23, 2017 (Doc. 19-10 at 35–49). At the beginning of each
16 treatment note, narcolepsy without cataplexy appears at the top under "Active Problems,"
17 but under "History of Present Illness," it states "[h]e has cataplexy with laughing or fear
18 and will sleep from short moment[s] to hours, this occurs about 6x/year." (Doc. 19-10 at
19 35, 38, 41). The Court agrees that the ALJ erroneously determined that Plaintiff's diagnosis
20 had changed from narcolepsy with cataplexy to narcolepsy without cataplexy but finds that
21 the ALJ's error was harmless because his finding that Plaintiff's symptoms improved was
22 otherwise supported by substantial evidence in the record.

23 The ALJ correctly noted that Plaintiff's original diagnosis was "narcolepsy with
24 daytime hypersomnolence" in Dr. Baratz's treatment notes in 2004 and 2005. (Doc. 19-9
25 at 32–35, 37). However, in notes from his follow up visits in November 2013, March 2016
26 and June 2017, Plaintiff's diagnosis is listed as "narcolepsy without cataplexy," even
27 though the treating providers also noted that Plaintiff "has cataplexy with heavy laughing
28 or fear and will sleep from short moment to hours, this occurs about 6x/year." (Doc. 19-9

at 38, Doc. 19-10 at 35–40). In contrast, treatment notes from February 2018 and March 2019 indicate that Plaintiff's diagnosis changed to narcolepsy with cataplexy, and Gourdoux submitted a medical opinion dated February 2018 noting the same. (Doc. 19-10 at 51–57). In both Gourdoux's February 2018 opinion letter and Dr. Baratz's March 2019 treatment notes, however, Plaintiff's cataplexy and other narcolepsy symptoms are referred to as "improved," although his sleepiness and daily nap requirements remained. (*Id.* at 51, 55).

However, as discussed above, the ALJ cited multiple reasons for his finding that Plaintiff's condition had medically improved, relying on notes from Plaintiff's treating providers and his own subjective statements that his symptoms have been improving and are controlled with his prescribed medications. (Doc. 19-3 at 14–15). Even though the ALJ erroneously referred to Plaintiff's changed diagnosis incorrectly, the ALJ still reviewed and weighed the credibility of the evidence in the record to come to a reasoned decision and provided additional justification for his decision that is supported by substantial evidence in the record. For example, the ALJ noted that Plaintiff's medical condition appeared to have improved since his CPD because in March 2015 he reported that his narcoleptic episodes were "rare" (Doc. 19-9 at 114), and Dr. Baratz's March 2019 treatment notes indicate that "[w]hen he takes this combination of medication his narcolepsy and cataplexy are controlled" (Doc. 19-10 at 55). Later in his opinion, the ALJ also notes that Plaintiff's allegations of worsening narcolepsy symptoms are inconsistent with evidence that he performs normal daily activities, including taking care of his children, driving his children to school, and hiking. (Doc. 19-3 at 16–17). The Court finds that the ALJ's erroneous statement regarding Plaintiff's changed diagnosis would not have changed the outcome of whether Plaintiff's condition medically improved in view of the record as a whole. *See Marsh v. Colvin*, 792 F.3d 1170, 1172 (9th Cir. 2015) ("ALJ errors in social security cases are harmless if they are inconsequential to the ultimate nondisability determination.") (quotations omitted).

Finally, Plaintiff argues that the ALJ improperly substituted his own opinion for that

of Plaintiff's medical experts because the ALJ found that Plaintiff's narcolepsy "is under reasonable control with Dexedrine and Nuvigil," contrary to evidence in the record. (Doc. 24 at 11). In particular, Plaintiff cites to Exhibit 15F, a February 27, 2018 letter from Nurse Practitioner Stacey Gourdoux opining that Plaintiff "continues to have severe daytime sleepiness and requires high doses of stimulants to maintain wakefulness. Despite stimulants he continues to need at least 2 naps during the day." (Doc. 19-10 at 51). However, Gourdoux's opinion also states that Plaintiff's "history of cataplexy has improved through avoidance behaviors." (*Id.*) Moreover, the ALJ also cited to Exhibits 14F and 16F for the same finding regarding Plaintiff's improved symptoms (Doc. 19-3 at 14–15), which include Dr. Baratz's and Gourdoux's treatment notes with observations that Plaintiff's medication has been "very effective" at controlling his narcolepsy (Doc. 19-10 at 55) and that Plaintiff was "tired but improved taking Dexedrine" (Doc. 19-10 at 41). The ALJ summarized the above-referenced objective medical evidence in finding that Plaintiff experienced medical improvement in relation to his condition at the CPD. (Doc. 19-3 at 14–15). Thus, the Court does not agree that the "ALJ substitut[ed] his own opinion for those of the medical experts." (*See* Doc. 24 at 11). This Court declines Plaintiff's request to second guess the ALJ's reasonable determination that objective evidence supports a finding of medical improvement, even if such evidence could give rise to inferences more favorable to Plaintiff. *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

Accordingly, the Court finds that the ALJ evaluated the evidence in the record and provided specific and legitimate reasons for his decision regarding Plaintiff's medical improvement. *See Andrews*, 53 F.3d at 1039–40 ("The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. We must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.") (citations omitted).

### c.  Treating Physician Testimony

Plaintiff argues that the ALJ improperly gave only "some weight" to treating physician Dr. David Baratz's opinion without sufficient justification for rejecting it. (Doc.

24 at 12). Dr. Baratz treated Plaintiff at the time of his CPD and has continued to treat him since. (Doc. 19-3 at 14; Doc. 24 at 12). The ALJ noted that Dr. Baratz diagnosed Plaintiff with "severe daytime 'hypersomnolence'" based on Plaintiff's reports of his narcoleptic episodes happening "almost daily," but that Dr. Baratz noted he was unable to find an effective medication for Plaintiff at that time. (Doc. 19-3 at 14). The ALJ further noted that by November 2014, Dr. Baratz and Plaintiff both reported that his narcolepsy symptoms where under control with his prescription medications. (*Id.*)

Dr. Baratz also submitted a medical statement dated March 6, 2019 which concludes that Plaintiff has "medical reasons for his inability to work." (*Id.* at 17, quoting Doc. 19-10 at 57). In that same statement, under "History of Present Illness," Dr. Baratz notes:
> [Plaintiff] has severe cataplexy that limits his ability to function. He will develop muscle loss, and will go to sleep at unexpected times. He will sleep from short moment to hours. This is brought out by laughter, strong emotion, changes to his level of attention, if he is frightened or scared. ***This symptom occurs every 2 to 3 days or sometimes more often. They are significantly less when on medication.*** He denies hallucinations with medication. No anxiety or other AE with meds. He does need to take 2 naps a day despite use of medications and he is still able to fall asleep easily. He continues to be affected daily by narcolepsy symptoms. He continues to have sleep paralysis and somnambulism. His cataplexy is brought out by emotions and laughter. He develops episodes of cataplexy almost daily.

(Doc. 19-10 at 55) (emphasis added). Dr. Baratz further notes Plaintiff's current prescription for Dexedrine and Nuvigil and concludes that "[w]hen [Plaintiff] takes this combination of medication his narcolepsy and cataplexy are controlled." (*Id.*)

In evaluating Plaintiff's RFC, the ALJ addressed Dr. Baratz's March 6, 2019 statement regarding Plaintiff's ability to work as follows:
> Although Dr. Baratz has a longitudinal knowledge of the claimant's medical history, this is an issue reserved to the Commissioner and as such, this opinion can never be entitled to controlling weight and must be carefully considered to determine the extent to which it is supported by the record as a while or contradicted by persuasive evidence (20 C.F.R.

>404.1527 (e)(1)). Accordingly, the undersigned affords this opinion some weight.

(*Id.*)

Plaintiff argues that the ALJ should have given Dr. Baratz's opinion greater weight and deference as a treating physician's medical opinion. (Doc. 24 at 12). Specifically, Plaintiff argues that the ALJ "gave no sensible reasoning" for his decision to only afford Dr. Baratz's opinion some weight. (*Id.*)

For claims filed prior to March 27, 2017, the weight that a particular opinion is afforded is based on who is giving that opinion. *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014). "Generally, the opinion of a treating physician must be given more weight than the opinion of an examining physician, and the opinion of an examining physician must be afforded more weight than the opinion of a reviewing physician." *Id.*; *see* 20 C.F.R. § 404.1527(c)(1)–(2). But a treating physician's opinion is not necessarily conclusive. *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002). If a treating physician's opinion is contradicted by another physician's opinion or other evidence in the record, an ALJ may reject it "by providing specific and legitimate reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citation omitted).

Additionally, Section 404.1527(d) outlines how the SSA treats medical opinions that opine on issues reserved to the Commissioner for claims filed before March 27, 2017. 20 C.F.R. § 404.1527(d). Issues reserved to the Commissioner "are administrative findings that are dispositive of a case," such as an opinion that a claimant is "disabled or unable to work." *Id.* § 404.1527(d)(1) (internal quotations omitted). It is the SSA's responsibility, not Plaintiff's doctors, to determine whether Plaintiff meets the statutory definition of disability, so the SSA "will not give any special significance to the source of an opinion" on such issues. *Id.* §§ 404.1527(d)(1), 404.1527(d)(3).

Here, the ALJ gave a specific and legitimate reason to discount Dr. Baratz's opinion that Plaintiff "has medical reasons for his inability to work" and rely on other evidence in the record. The Court agrees that the "Assessment" portion of Dr. Baratz's March 6, 2019

medical statement could be construed as opining on an issue reserved to the Commissioner, namely, whether Plaintiff is capable of working. *See* 20 C.F.R. § 404.1527(d). However, the Court disagrees with Plaintiff that the ALJ entirely rejected Dr. Baratz's opinion or otherwise did not give it adequate weight. Instead, the ALJ relies on Dr. Baratz's opinion throughout his decision, noting twice that Dr. Baratz's finding that Plaintiff's narcolepsy is controlled with medication is consistent with the overall record. (Doc. 19-3 at 14–15, 16, citing Doc. 19-10 at 55–57). While it is generally true that a treating physician's opinion is entitled to controlling weight, the Court does not find any legal error in the ALJ's decision to rely on only the portions of Dr. Baratz's opinion that were consistent with and supported by other evidence in the record and to disregard the portion opining on Plaintiff's ability to work. *See Castro v. Comm'r Soc. Sec.*, No. CV-20-00995-PHX-DLR, 2021 WL 1085392, at *5 (D. Ariz. Mar. 22, 2021) ("[A]ccording to Social Security Ruling 96-5p, administrative findings, such as opinions about whether an individual is disabled or unable to work, are reserved to the Commissioner.").

### IV. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the ALJ's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.

Dated this 23rd day of November, 2021.

James A. Teilborg
Senior United States District Judge